PATRICK O'BRIEN

*v.*

THE PATERSON BREWING AND MALTING COMPANY.

[Submitted February ——, 1905. Decided May 10th, 1905.]

1. In a suit to restrain the enforcement of a note and mortgage given to defendant brewing company as a part of a transfer of a saloon business to complainant, evidence *held* to establish a parol agreement at the time such securities were executed that defendant company would not enforce them so long as complainant purchased his beer of it.

2. Where defendant's agent, as a part of a sale of a saloon to complainant, agreed that complainant would not be called on to pay a note and mortgage given for prior indebtedness of the former occupant of the saloon to defendant so long as complainant bought his beer of defendant, and the latter accepted the benefits of such contract, it was not thereafter entitled to deny its agent's authority to make such collateral agreement.

3. Where, as a part of an agreement for the transfer of a saloon business to complainant, he executed a note and chattel mortgage on the fixtures to defendant brewing company for an amount larger than the value of such fixtures, which amount represented an indebtedness of the prior occupant of the saloon to defendant for beer, &c., parol evidence, in a suit to restrain defendant from collecting such note and enforcing the mortgage, that defendant's agent orally contracted that the note and mortgage should not be enforced against complainant, but was required merely as a convenience of bookkeeping on defendant's part, and was intended merely to compel complainant to purchase beer from defendant, was not objectionable as tending to vary the terms of the contract.

4. Complainant purchased a saloon located in a building the lease to which was subject to termination on short notice, having no valuable good will, agreeing to pay in cash the value of the stock on hand, and to give a mortgage to defendant brewing company for the amount of an indebtedness owing by the seller of the saloon to defendant for beer, advances, &c., the amount of which was largely in excess of the value of the fixtures, under an agreement that the securities should not be enforced so long as complainant purchased beer from defendant.—*Held,* that complainant, on ceasing to purchase defendant's beer, was entitled to restrain the enforcement of the note and mortgage on tendering to defendant the reasonable value of the fixtures.

On final hearing on bill, answer and proofs.

*Mr. J. Herbert Potts,* for the complainant.

*Mr. J. Merritt Lane,* for the defendant.

PITNEY, V. C.

The complainant, Patrick O'Brien, by his bill, asks the court to restrain the defendant, the Paterson Brewing and Malting Company, from enforcing, in an action at law, a promissory note, dated July 9th, 1903, made by the complainant to the order of the defendant, for $2,902.65, payable on demand.

The ground of the complainant's relief in equity is that the note was given under circumstances and upon assurances given by the defendant which render it inequitable for it to enforce it.

The circumstances are these: For several years prior to 1892—the precise time is unimportant—one Moran had been proprietor of a liquor and beer saloon at 101 Hudson street, Jersey City, of which he was a mere tenant from year to year. The establishment was not successful.

The fixtures had been put in by a firm of liquor dealers upon the usual terms that they expected the tenant (Moran) to buy his supply of liquors from them, and, presumably, they held a chattel mortgage for the cost. About the time mentioned (1892), one Christy Kau, who had been a bartender for Moran, undertook to start up the business.

The Paterson Brewing Company, the defendant herein, with the view of promoting the sale of its beer, bought out the interest of the liquor company in the fixtures, for about $2,400, and placed Kau in possession, with the usual understanding that he was to buy his beer of it.

He continued in the place until 1902, selling defendant's beer, but running behind in his accounts continually, till he was largely in debt.

At that time (1902) the place stood in debt to the defendant $2,902.65, consisting partly of the cost of the fixtures and partly for the arrearages due for beer furnished Kau.

The fixtures, by reason of wear and tear, were really worth not over $500, and the good will of the place was of no value, for it had never been prosperous.

Kau had no pecuniary responsibility.

Whether he had ever executed a chattel mortgage and a promissory note to the amount of the indebtedness does not fully appear.

One difficulty in managing the place with success was that the owner was unwilling to give a long lease upon it, but reserved the right to sell and convey at any time and terminate the tenancy on short notice.

In this condition of affairs, on the 29th day of April, 1902, a Mr. Oscar Sommers, a man without any pecuniary responsibility, either then or later, was induced to buy Mr. Kau's interest in the saloon. The nominal price paid was $2,902.65, for which a new chattel mortgage and promissory note was made by Sommers to the defendant.

I stop here to say, by way of explanation, that this practice of proprietors of breweries owning the fixtures of beer saloons—holding a chattel mortgage thereon—when they do not hold the title to the same and sometimes having a long lease therewith, is very common; the object being to enable the brewer to compel the saloonkeeper to purchase his beer from the brewer, and so long as he does that, and keeps up a good trade by selling a good deal of beer and paying for it, it is well understood among saloonkeepers that the mortgage and the debt which it secures will not be enforced. And that was the understanding in this case of Sommers' note and mortgage. He was a man of no personal responsibility and never expected to be called upon to pay anything on the mortgage so long as he was loyal to the brewery and bought his beer of it. The indebtedness of that kind is understood to be the indebtedness of the place and not of him who keeps it, and Mr. Sommers swears that he was told by Gerken that it was necessary for him to give the note and mortgage in order to keep the books of the brewery straight.

During these years Mr. Diedrich Gerken was the selling agent and manager for the defendant in Jersey City.

Sommers was no more successful than Kau. He loyally purchased his beer from the defendant, but was not able to make prompt payment for it, much less to pay anything on account of either interest or principal of his promissory note and mort-

gage, or to keep his rent paid, and the place was losing money, and, of course, the good will was worth nothing.

Sommers' license expired on one of the last days of May, 1903, and it was not renewed. This was probably due to his inability to pay the license fee and to the defendant's unwillingness to pay it for him. Sommers, however, kept the place open, but, as he swears, sold no liquors or beer.

In the early part of July, 1903, Mr. Gerken called on the complainant, who was a prosperous saloonkeeper at 249 Warren street, Jersey City, and asked him to undertake 101 Hudson street·also, and the complainant agreed to do so and run it for defendant.

At that time Sommers was indebted to Gerken for $175 for rent paid for him, and for further arrears of rent, and he had only between $80 and $100 worth of liquors and cigars on hand.

Complainant agreed to advance money enough to pay the arrears of rent and for the liquors on hand, so as to satisfy both Sommers and Gerken, and in the end paid in cash $275 as the amount agreed for that purpose. Then, according to complainant's account, Gerken said to him that it would be necessary for him to give a note and chattel mortgage for the amount of the old indebtedness, but that he (the complainant) would never be called upon to pay it. Gerken denies this. In fact, as I interpret his evidence, Gerken denies that any discussion was had at any time between him and complainant upon the subject of the latter's personal liability. Nevertheless, the whole negotiation must be treated as being subject to the custom in vogue between beer sellers and brewers before referred to. And defendant's counsel, at the hearing, frankly admitted that had complainant continued to buy his beer of defendant he never would have been called upon to pay the note.

The terms being agreed upon, the parties—complainant, Gerken and Sommers, with Mr. Peshall as counsel for Sommers—proceeded to the office of Mr. Potts to have the papers drawn.

There had been no previous conference between the complainant and Mr. Potts, or any other counsel, as to the affair. It does not appear even that Mr. Potts was complainant's standing

counsel, and he appears to have known nothing about the circumstances of the present affair.

He was instructed to prepare a bill of sale from Sommers to complainant, and a chattel mortgage from complainant to defendant, and a promissory note for $2,902.65, which he did, and when the papers were ready for execution he asked the complainant, so complainant swears, if he understood what he was signing, to which complainant responded that he did, and that it was all understood between him and Gerken, and thereupon, and before signing the papers, Gerken arose and said that it was all understood between them, and that complainant would never be called upon to pay a cent. In this he is corroborated by Mr. Sommers and Mr. Potts. The latter's evidence is quite explicit. He understood when the parties came that they had been to the office of another lawyer and had not found him in. The instructions were given by Mr. Gerken, and also by, he thought, Mr. Peshall, to draw the papers mentioned. After he had prepared the papers and after Sommers had signed the bill of sale, his testimony proceeds:

"I says to O'Brien—I hadn't heard the details what it was about—I said to O'Brien, 'O'Brien, do you know what you are doing?' Mr. Gerken jumped up—he was sitting right in front of the long table I had in my room—and he says, 'O'Brien and I understand each other; O'Brien, you will never have to pay that note or mortgage,' and thereupon O'Brien signed the paper; I didn't know then about the details of it at all—in fact, I didn't know what it was about, or what they had arranged.

"*Q.* You knew it was for the beer saloon?

"*A.* I knew it was for a saloon because I put in the schedule about it."

Mr. Peshall swears that he did not hear Mr. Gerken make the declaration to which Mr. Potts swears, but does recollect that Potts asked O'Brien if he knew what he was doing, and that he heard O'Brien say that he understood it—that he and Gerken understood all about it. To this extent he corroborates the complainant. And it may be here remarked that Peshall's whole interest there was to see that Mr. Sommers got his payment in cash, and had his $2,900 note delivered up to him.

Now, this evidence of Mr. Peshall, who was called by the defendant, to the effect that complainant said that the matter was

understood between him and Gerken, is significant as showing
that there had been an understanding of some sort between the
persons just named.   And the fair inference is that it was an
understanding in regard to the liability incurred in signing the
note.

Mr. Gerken denies that he made any such declaration, and,
as I have before observed, denies that there was any such ar-
rangement between him and O'Brien as the latter swears to.

The clear weight of the evidence in this matter, as far as wit-
nesses go, is in favor of the complainant.

It is to be observed that it is not a case of the misunderstand-
ing, by different witnesses, of the tenor and details of the con-
versation, or the intention and effect of it, in which witnesses
are liable to differ in their recollection and understanding; but
it is an assertion by three witnesses, including the complain-
ant, that Gerken, the defendant's agent, at a particular moment,
rose from his seat and made a particular and special declaration,
of great importance and pertinent to the very matter in hand.

It is quite difficult to believe that Mr. Potts and Mr. Sommers
invented this incident and declaration, as they must have done
if they did not actually hear it; while, on the other hand, it is
quite easy to conceive that Mr. Peshall may either not have heard
it or not have paid such attention to it as that it made any im-
pression on his mind or memory.

But let us look at the probability of the thing.   The com-
plainant was an experienced saloonkeeper and was a good judge
of the value of the fixtures in 101 Hudson street.   He also knew
that the saloon had no good will.   He also knew that he must
procure a license for it, and he also knew that it was not worth
any such money as $3,000.   Is it at all likely that he would
knowingly bind himself absolutely to pay such a sum of money
for it?   I think not.

In order to believe that the complainant was willing to obli-
gate himself to pay such a sum of money over and above his
$275 actually paid, it is necessary to believe that he was lacking
in the ordinary prudence and caution which a man able to take
care of himself in the ordinary paths of life must possess.   More-
over, a man of the business capacity which the complainant is

charged by the defendant with possessing would naturally inquire as to the lease upon the premises—whether it. could be obtained and on what terms as to rent and occupation—and such an inquiry would have shown him that the only security for continuing the possession was to purchase the fee, and that by so doing he could oust the present tenant.

And here, it must be observed, that the amount of the promissory note was precisely the same, to a cent, as that given by Mr. Sommers fifteen months previously. There was no new accounting; there was no inventory or appraisement made of the fixtures, and it was admitted at the hearing that they were not worth over $500, and so I find it impossible to believe that the complainant signed the note with any expectation that he would be called upon to pay it.

Another small circumstance was that the $275 actually paid went directly to Gerken, and out of it he paid Sommers $100 for his stock of goods, and the balance was applied toward paying an indebtedness to defendant or Gerken for rent actually paid by one of them for the premises.

I therefore conclude that the complainant has made out that part of his case and that the transfer was made and the note accompanying the chattel mortgage was given with the distinct and express understanding that he was not to be called upon personally to pay it.

In this case there was no express agreement on the part of the complainant to purchase beer from the defendant, and the defendant's agent does not allege that there was any such condition annexed to his promise that the complainant should not be called upon to pay his note, for he denies in the most emphatic manner that there was any such promise or understanding, either express or implied. Nevertheless, the complainant must have understood that the defendant expected him to buy his beer of it.

These papers having been signed and delivered, Sommers vacated and complainant took possession of the premises on which were situate the mortgaged chattels. No lease was executed to the complainant by the owner, although the evidence shows that the defendant agreed to procure a lease to the complainant. But

such lease was of no consequence, because, as already observed, the owner, who was a real estate company, was unwilling to grant a lease except upon terms of being ended at any time, upon short notice, when it should make a sale.

The complainant took out a license and was assisted therein by the defendant. Whether the assistance was of any value does not appear and is immaterial.

Now, the question arises, what, at that period of time, were the relative rights and duties of these parties towards each other, according to the principles of right between man and man as viewed and recognized by a chancellor.

In the first place, while I do not understand that anything was said upon the subject, I think, as already observed, that it may be assumed, as a matter of common knowledge, that the new mortgage was taken and the complainant put in possession upon the understanding that the mortgage would not be enforced so long as complainant continued to buy his beer of the defendant. The practice of brewers either owning or controlling by a chattel mortgage the fixtures in a beer saloon, and using such control for the purpose of making sale for their beer, is so well known as to be almost a matter of common knowledge.

The avowed object of the defendant in inducing the complainant to undertake the running of the saloon was to make an increased market for its beer.

But, then, on the other side, the complainant was not under any obligation to purchase his beer from the defendant, unless he found it to his advantage to do so, and that involved the quality and gratefulness of the beer to the taste of consumers.

No doubt, also, the defendant expected and hoped that complainant, by reason of his experience and skill in the business, would be able to build up a large trade. But I think it had no right to feel that complainant was under any obligation to give the defendant the benefit of that increased business. As before remarked, the good will of the establishment was of no value. The trade had long been at a point which produced no profit. Complainant was under no obligation to build up the trade for the benefit of the defendant.

Without the control of the building and room itself, either by

ownership or long lease of the fee, it is plain that the mere ownership of the fixtures gives the brewer but a slight hold upon the retailer. On the other hand, the complainant took possession of these fixtures, knowing all the circumstances and knowing the expectations of the defendant, and he was under obligation not to act in such a manner as to injure or depreciate the value of the fixtures.

They were put there by the consent of the owner of the real estate, who had the undoubted right, in a reasonable manner and after a reasonable notice, to require the defendant to remove them, but I do not think the complainant had that right under the circumstances of this case, even though he was subrogated to the rights of the owner.

Now, it is common knowledge that fixtures put in the way in which those were may, and usually do, include many matters which are incapable of removal, such as decorations and articles of ornamentation, so that the value of the fixtures for use must be held to be much greater than what they are for removal.

My conclusion is that complainant's duty was, if for any reason he desired to stop purchasing beer of the defendant, to offer to pay to the defendant a fair and reasonable value for the fixtures as they stood.

Now, what happened was this: Complainant did purchase beer of the defendant for a short time—a few weeks or months— but found, as he swears, and he is therein uncontradicted, that the beer was distasteful to his customers, and that he could not build up a trade upon it, and that he thereupon, for that reason, ceased buying the defendant's beer and purchased elsewhere.

This, I think, he was entirely justified in doing, whether the beer was good-selling beer or not; but I must take the complainant's evidence upon that subject as reliable.

Surely any understanding between the parties that complainant was to buy defendant's beer and build up a trade upon it was conditioned on the beer being grateful to the taste, and in that sense marketable.

I say that the complainant was entirely right in ceasing to buy beer of the defendant, but he should have offered to purchase the fixtures at a fair valuation, and the defendant should have

been satisfied to accept such an offer, for it was all the interest it had in the premises.

This the complainant swears he offered to do. As I understand his evidence, he swears he offered to pay the defendant what the fixtures were fairly worth, and finally offered $500, all before the fixtures were removed. And I understand Gerken's evidence to be to the effect that that is what he considered them to be worth, and what the defendant, who bought them in at the foreclosure sale, finally realized for them, and he admits the complainant made the offer.

The complainant's offer, however, was on condition that his note should be delivered up to him.

But this offer the defendant refused to accept, or to negotiate on the basis of the value of the fixtures and the return of the note, and determined to stand upon its legal rights and proceeded to foreclose the mortgage.

The result is that I come to the conclusion that complainant's conduct has been in strict accordance with equitable rules.

There is another view of the case which has not escaped me, though not put forward by defendant's counsel, and that is, that the promissory note in question, though given for many times the value of the property which formed its whole consideration, may be, from a legal standpoint, considered in the nature of a penal sum mentioned in a bond given to secure a certain course of conduct on the part of the obligor. I think I remarked, during the hearing, that the personal obligation, in cases like the present, was held by the brewer as a sort of club in its hands by which it could compel the maker to continue to purchase his beer, and that the moment he ceases to do so the brewer is entitled at law to enforce it to the last cent. I have given this subject careful consideration and am unable to yield it any force beyond imposing on the party the equitable duty which I have already cited. I see no reason to doubt his statement that he attempted to make a success of selling defendant's beer and failed. But granting that his conduct in that respect was not in good faith, the case still stands as one where the *quasi*-obligor is entitled to come into equity to be relieved from the penalty, upon making the defendant whole for such damages as he has

suffered by the complainant's default; and the question arises at once, what damages has it suffered? Clearly only such prospective profits as it would have realized from the beer sold, and it seems to me hardly necessary to cite authority for the proposition that prospective profits cannot be considered for that purpose.

I find it impossible to relieve the defendant from the condition which it actually occupied. It owned these fixtures in a building belonging to another party, who had the right to remove them at his pleasure after reasonable notice, and hence they were worth to the defendant no more than their removal value, and that was no more than $500, and this the complainant offered to pay it, but I am willing to give the defendant an opportunity to prove that they were worth more than that to the complainant, and to give it the benefit of such excess.

After the foreclosure and removal of the fixtures the complainant purchased the fee, taking the title in the name of his wife, who, he swears, furnished the money to pay for it. I am unable to see how that purchase weakens his standing in this court.

One other part of the evidence requires notice before considering the only difficult question of law or equity in the case.

The president of the defendant company swore that the agent, Gerken, had no authority to make the pledge, which I am entirely satisfied he did make, as to the liability of the complainant on the note, and Gerken swears to the same thing, and from this want of authority it is argued that the defendant is not bound by the stipulation. But the plain answer is that the defendant is suing on a contract procured by its agent by means of the very pledge in question, and must therefore take the contract subject to that pledge. It cannot approbate and reprobate.

We now come to the only difficult point in the case.

Against any relief is urged the time-honored rule that parol evidence cannot be used to vary or contradict the terms of a written contract.

Without stopping at this moment to enumerate and classify the numerous exceptions to that rule, especially in a court of equity, it is sufficient to say that the evidence here relied upon

does not tend to vary the terms of the contract. There is no contention that the complainant did not understand that he was signing an absolute promissory note in favor of the defendant, payable one day after date, and negotiable in its terms. What he does contend is that it never had any binding effect upon him in equity.

To show this by parol is no more a breach of the rule invoked than it is to prove that an absolute deed is given as a mortgage, or that a promissory note is given by the maker to the payee without consideration and as an accommodation to the latter, or that it was given for a consideration that had wholly failed, or was a mere gift, as in *Metler* v. *Metler, 18 N. J. Eq.* (*3 C. E. Gr.*) *270,* and affirmed on appeal, *19 N. J. Eq.* (*4 C. E. Gr.*) *457.*

In that case the bill was filed to enjoin a recovery on a promissory note given by the intestate to his mother, upon the understanding that it should be returned to the maker in case he returned from a trip to the oil regions, which he did, and the note was not delivered up to him.

The real question for consideration in this case is whether, under the circumstances, it is equitable that the defendant should recover upon the note, and that is always the question in cases like this.

Shall a payee who has procured from the maker a promissory note for a sum of money which the maker does not owe him, upon a pledge that he shall not be called upon to pay it, be permitted, in equity, to recover upon the note at law?

It is true that the note was given as part of a transaction with a color of consideration, so that it is highly probable, if not certain, that no defence can be made to it at law, but it is still true that the complainant did not owe the defendant any such sum of money.

The only real value received by complainant for the note was the fixtures in the beer saloon. They were, indeed, carried on the books of the defendant at about $2,400, but they were not worth any such sum of money, as we have seen, having undoubtedly very much depreciated during the many years they were in use. And against their value must be credited so much

of the $275 paid by the complainant as was not represented by the stock of cigars and liquors on hand.

All above that value represented an old debt for beer sold to Kau, assumed by Sommers and inserted in the note of the complainant.

Now, to the extent of the value of the fixtures as they stood for the purpose of the use that was being made of them, complainant became justly indebted to the defendant, and the question is whether, under these circumstances, having signed his note under the express pledge that it would not be enforced, it is equitable and just that it should be enforced.

It is to be observed that the note had an actual place in the transaction without giving it validity as a personal obligation. The usual mode of giving a mortgage, whether on realty or chattels, is to have it accompanied by a personal obligation, and oftentimes it is done without proper consideration of its effect in case of a deficiency of the pledge to pay the debt. So far has this gone that several years ago the legislature intervened and limited the liability of the makers of bonds secured by mortgages upon real estate.

Moreover, it is quite clear that this note was not made to be negotiated according to the custom of merchants.

It has been said that the rule sustaining the sanctity of written contracts against parol evidence is as strictly maintained in equity as at law, but I cannot admit the accuracy of that statement.

I have made a careful examination of the authorities upon that subject and find they do not sustain it, except in the matter of the true construction of a contract. But when we come to the inquiring into the objects and purposes of a writing, equity is more liberal, and will not permit a written contract to be used for purposes for which it was not intended.

"If," says Chancellor Williamson, in *Stoutenburgh* v. *Tompkins,* *9 N. J. Eq. (1 Stock.) 332* (at *p. 336*), "such are the principles by which a court of equity is governed, in the exercise of this branch of its jurisdiction, it follows, that however closely the court may be disposed to adhere to the salutary rule of law that parol evidence is not admissible to vary, contradict or con-

trol a written instrument, it must necessarily exercise much more liberality in admitting evidence in order to reach the equity of the case than would be allowed by a court of law." And, again (at *p. 337*): "But there is a great difference between introducing parol evidence for the purpose of showing that the writing does not express the true intention of the parties and in introducing it for the purpose of showing the circumstances which make it inequitable and unconscientious that the intention should be carried out."

The late Judge Field, of the supreme court of the United States, in speaking for the supreme court of California, in *Pierce* v. *Robinson, 13 Cal. 116; 2 Lead. Cas. Eq. 1987,* said: "Parol evidence is admissible in equity to show that a deed, absolute upon its face, was intended as a mortgage, and the restriction of the evidence to cases of fraud, accident or mistake in the creation of the instrument, is unsound in principle and unsupported by authority."

"As the equity upon which the court acts arises from the real character of the transaction, it is of no consequence in what manner this character is established, whether by deed or other writing, or by parol. Whether the instrument, it not being apparent on its face, is to be regarded as a mortgage, depends upon the circumstances under which it was made and the relations subsisting between the parties. Evidence of these circumstances and relations is admitted, not for the purpose of contradicting or varying the deed, but to establish an equity superior to its terms. * * * The rule which refuses the admission of parol evidence to contradict or vary written instruments is directed to the language employed by the parties. That language cannot be qualified, but must be left to speak for itself. The rule does not exclude inquiry into the objects and purposes of the parties in executing the instrument."

Vice-Chancellor Dodd, in *Sweet* v. *Parker, 22 N. J. Eq.* (7 *C. E. Gr.*) *453* (at *p. 457*), says: "The distinction between parol evidence to vary a written instrument and parol evidence showing facts which control its operation, is employed to reconcile the allowance of such proofs with the statute of frauds and the general rules of common law." He then refers to *Thorn-*

*borough* v. *Baker,* *2 Lead. Cas. Eq.* \**1030,* and to the notes commencing at *p. 1983* of the fourth American edition.

Other cases are found in the notes to *Woollam* v. *Hearn,* *2 Lead. Cas. Eq.,* commencing at *p. 944.* At *p. 948,* the American annotator says that the recent course of English decisions tends to qualify and restrict, rather than enlarge, the operation of the rule that a written contract cannot be varied or controlled by a contemporaneous oral stipulation, citing numerous cases at law in illustration, among others *Wallis* v. *Littell, 11 C. B. (N. S.) 369 (1861).*

In that case the suit was brought to enforce a written contract by a farmer, who held as a tenant of a landlord, to convey his whole tenant right and possession to the plaintiff at a fixed sum. The contract was complete in all its parts. The defendant refused to fulfill on the ground that there was a verbal agreement, made at the time of entering into the written contract, that it was not to be binding unless the landlord consented to it, and this defence was held good and prevailed at law.

To have held otherwise would have added another example to the many which the reports show of the injustice of the universal application of the rule now in question.

In answer to this injustice, judges have said that people must not rely on oral promises, but have everything put in writing. But the answer to that suggestion is that people do in practice rely on oral promises, and equity and fair dealing require that they should be protected therein.

To the view of a chancellor it is no more equitable and just that a man should not have the benefit of a parol promise of the character here in question, which he has acted upon, than it is that he should not have the benefit of a parol contract to convey lands upon which he has acted in such manner that he cannot be restored. As the court will not permit the statute of frauds to be made an instrument of fraud, so it ought not to permit the rule that parol evidence cannot be permitted to alter or vary a written contract to be made an instrument of fraud.

In my judgment, it is what is known in equity as a fraud for one person to procure from another his promissory note upon a verbal promise or pledge that it shall not be enforced, and after-

wards to invoke the rule in question in order to be able to enforce it.

It has sometimes been suggested and supposed that there must have been a fraudulent intent on the part of the party making the verbal promise or agreement entertained at the time of so making or entering into it—that is, that there should have been fraud in the inception of the affair—but this is not necessary. It is now well settled that the act which excites the jurisdiction of the court, and which the court calls fraudulent, is the setting up of the statute of frauds as a defence to a suit for specific performance, where, according to the notions of the chancellor, it is inequitable and unjust so to do. Such conduct the court classes as fraudulent.

Sir William Grant, in *Buckmaster* v. *Harrop,* *7 Ves. 341* (at *p. 346*), in discussing the part performance necessary to avoid the effect of the statute, says: "For the ground upon which the court acts is fraud in refusing to perform after performance by the other party." Professor Pomeroy, in his book on *Specific Performance* (§ *103*), says:

"The doctrine of part performance is merely a particular application of the general principle which supports a great part of the equitable jurisdiction—the principle that fraud shall be prevented, relieved against or punished in whatever form or under whatever guise it may appear. It is simply saying that a man shall not be permitted to use a statute more than any other assistant for the purpose of promoting his own fraudulent intent."

And then, after quoting the familiar language of Lord Westbury, in *McCormick* v. *Grogan, L. R. 4 H. of L. 82* (at *p. 97*), he proceeds as follows (§ *104*): "The foundation of the doctrine is fraud, not necessarily an antecedent fraud, consciously intended by the party in making the contract, but a fraud inhering in the consequence of thus setting up the statute." And to the same effect is Lord Justice Fry's language, in his book on *Specific Performance* (§§ *562, 563*), where he quotes with approbation the language of Lord Cottenham, in *Mundy* v. *Joliffe, 5 Myl. & C. 177*, where he says that courts of equity exercise their jurisdiction in such cases "for the purpose of preventing the great injustice which would arise from permitting a party to escape

from the engagements he has entered into upon the ground of the statute of frauds," &c.

Let us examine some of the authorities in this state and elsewhere in this country. The case of *Meyer* v. *Beardsley, 30 N. J. Law (1 Vr.) 236,* was one where the acceptor of a bill of exchange (who occupied the position of maker of a promissory note) accepted it for the accommodation of the drawer of the bill (who occupied the position of endorser of a promissory note) upon condition, as he alleged, that the drawer would indemnify him. The action was at law, and mere equitable considerations did not intervene. But the payee of the bill received it as a negotiable, mercantile instrument, in payment of an indebtedness due to him from the drawer, occupying the position of endorser. There the acceptor accepted deliberately, before receiving the indemnity, and knew that the draft was held, and in fact presented, by a creditor who was accepting it in payment of his debt. What view a court of equity might have taken of the case it is not necessary to determine.

Then we have the case of *Wright* v. *Remington, 41 N. J. Law (12 Vr.) 48,* which was affirmed in *43 N. J. Law (14 Vr.) 451.* There a judgment had been entered upon note with warrant of attorney to confess judgment against a husband and wife, in which the wife signed as surety for her husband. This it was lawful for her to do by the laws of the state in which the note was executed. The defence was that the wife had been induced to sign the note and warrant of attorney by representation that she would not be called upon to pay them, and the court held that such evidence could not be used in a court of law as a defence to the judgment. The court recognized the great injustice that often arises out of the strict application of the rule, but approves of the doctrine that it is of great importance to the welfare of the community that the rule should be upheld. In that case, also, the creditor had acted on the strength of the validity of the wife's signature. What view a court of equity would have taken of the case it is not necessary now to determine.

There is a line of cases in Connecticut which are worthy of remark. *Daggett* v. *Whiting, 35 Conn. 366,* was a suit brought

by an administrator of the bearer of certain long-overdue checks, drawn by the defendant on his bank and payable to bearer, and loaned by him to a third party as an accommodation. The third party lodged them as security with the plaintiff's intestate, a money-lender, by whom they were held for a valuable consideration, and it was held that he could not recover. Here it appears that the defendant deliberately made his checks on the bank, not drawn against cash, and delivered them to his friend to be used for the purpose of sustaining his financial credit. The rule relied upon here was there set up without avail, notwithstanding that upon the defendant's theory of the case the checks were given and held without any possible useful purpose, for without making some use of them for credit in his business it is difficult to see of what useful purpose their preparation and signing served.

In *Downer* v. *Chesebrough, 36 Conn. 39,* the action was upon an unqualified endorsement of a promissory note upon which defendant had been duly charged as endorser. The successful plea was that the endorser had been induced by plaintiff to sell certain property to the maker of the note and to take the note in payment thereof, upon the promise by the plaintiff that he would accept said note in absolute payment of so much of the debt owing by the defendant to the plaintiff, and that he had endorsed the note over to the plaintiff in pursuance of that verbal contract. In short, it was the defence that by virtue of a parol contract the endorsement was without recourse. The defence was sustained as good at law.

In *Schindler* v. *Muhlheiser, 45 Conn. 153,* the case was this: The defendant had given the plaintiff his note for certain real estate conveyed to him by an absolute deed by the plaintiff. *Held,* in a suit on the note, that parol evidence was admissible, on the part of the defendant, to show that the conveyance was not intended as a sale, but was made by the plaintiff for a certain purpose of his own, and upon an understanding with the defendant that the land was afterwards to be conveyed back, and that the note was given at the time under an agreement that it was not to be paid. And judgment was accordingly entered for the defendant. The judge, in delivering judgment, after saying

that the plaintiff invoked the aid of a familiar rule of law that parol evidence is not admissible to contradict or vary a written instrument, and going over the facts of the case, says: "Instead of preventing fraud, such an application of the rule would perpetrate a fraud of the grossest character and bring reproach upon the law and the administration of justice."

The defendant's chief reliance is naturally upon the case of *Chetwood* v. *Brittan,* decided by Chancellor Pennington, and reported in *2 N. J. Eq. (1 Gr.) 438,* on motion for an injunction, and *4 N. J. Eq. (3 Gr.) 334,* on final hearing.

In respect to the object and subject-matter of the suit, and the attitude of the parties, the case is substantially on all fours with the present.

It is interesting to observe the operations of the mind of that exquisite equity judge in dealing with that case. Although the question was fairly raised on the preliminary hearing and the law was plainly laid down by him in his opinion, and all the equity of the bill was clearly and distinctly answered by the answer, and it seemed quite manifest that the complainant could only succeed by a disregard of the rule in question, yet the learned chancellor held the injunction until the final hearing. And when it came to final hearing he allowed the parol evidence to be read, and came to the conclusion that it did not sustain the complainant's case—that is, that the complainant did not prove his case, even by parol.

I deem it worth while to restate briefly the facts of that case, from which it will appear that it is quite different from the one before the court. There, Mr. Brittan, the defendant in equity and the plaintiff at law, bargained and sold to a syndicate of real estate speculators a piece of land in Elizabeth at a price agreed upon. There was no doubt about the land being at the time considered to be worth the money which was agreed upon as its price. It was in fact, however, inflated by the wave of speculation then prevalent, but that circumstance could not affect the fairness and validity of the bargain. There was not the least hint of overvaluation or fraud on either side. A part of the consideration was to remain upon bond and mortgage. Instead of requiring the bond of all the actual purchasers, Mr. Brittan,

at their request, conveyed the property to Mr. Chetwood, and accepted Mr. Chetwood's bond, secured by a mortgage. The latter accepted the title in trust for his brother speculators and for their convenience in reselling. He was entitled to, but did not exact, indemnity from his *cestuis que trustent* against danger from giving his individual bond, because all persons supposed that the property was ample security. At the last moment, as he was about to sign the bond, it struck him that he was incurring a personal obligation greater than he should, and so expressed himself, whereupon Mr. Brittan replied, in substance, that he need not be afraid to execute the bond on that account, as he would take the land at any time for the balance of the debt. The learned chancellor held that was a mere casual remark, incidentally made by the defendant, and not intended or understood by either of the parties, at the time, as affecting the personal liability of the bondsman. It is further to be observed that the subsequent disposition of the property by the bondsman and mortgagee rendered it impracticable for him to return the land to Mr. Brittan. The case was, after all, without merit on the part of the complainant from any point of view.

The present case, in its facts, is clearly distinguishable from *Chetwood* v. *Brittan.* Here there never could have been any pretence, for reasons already stated, that the property conveyed was worth for any purposes, at that time or any time subsequent, any such money as the nominal price fixed for it.

One other case decided in our records should be noted, viz., *Van Syckel* v. *Dalrymple, 32 N. J. Eq. (5 Stew.) 233.* That was a bill to foreclose, and the defence, which was set up by answer only, was that the terms of the mortgage did not correspond with the actual contract between the parties. It, in effect, charged a mistake in the preparation of the writings. Vice-Chancellor Van Fleet held that this defence was not admissible on the answer, but should have been put forward by way of cross-bill to reform the writings. He bases his conclusion upon the doctrine that parol evidence is not admissible to vary or alter a written instrument, and that the defences of that class cannot be set up by answer in foreclosure suits. The reason of this is that such suits are really, in their nature, not equity suits.

They are not framed to enforce an original equity, but simply to give the defendant an opportunity to pay his debts or be foreclosed of his equity of redemption. They are in fact suits to destroy an equity, not to enforce one. The language of the learned judge is this: "Oral evidence is admissible to reform a written instrument or to subvert or overthrow it entirely, but not to vary or alter it."

The distinction between that case and this is that here the complainant occupies the very position in the cause which the vice-chancellor held he must possess in order to have relief, and which the defendant in that case did not occupy.

It is quite competent to prove these facts by parol evidence, and those facts, in connection with the parol agreement, show a case which renders it inequitable and unjust for the payee of the note to enforce it at law, in the same manner and to the same extent that absolute deeds are shown to be mere mortgages, and that promissory notes made without consideration are shown to have been given as an accommodation.

But, if I am wrong in this view, then I am of the opinion that if, as the defendant contends, the actual intention of Mr. Gerken, its agent, was at the start to obtain a note, the payment of which was to be enforced under all circumstances, then he practiced an actual fraud upon complainant, and complainant is entitled to relief on that ground.

I have said that I think that complainant, in offering to pay the defendant what the fixtures were worth, performed all that equity required of him, but lest there should be the least danger of doing the defendant injustice in that respect, I will, if the defendant asks it, refer it to a master to inquire what was the real value of the fixtures to the defendant for use in that building. And if it appears that they were worth for that purpose more than $500, I will give the complainant relief upon condition that he pay the defendant the excess over $500. But such inquiry must be at the risk of the defendant as to costs. If the defendant chooses not to take such an inquiry, I will advise a decree for a perpetual injunction, with the delivery up of the note to be canceled.